## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **OLUWAFEMI M. OMOTOYE**, <br><br> Plaintiff, <br><br> v. <br><br> **TD BANK, N.A.,** *et al.*, <br><br> Defendants. | Case No. 22-cv-3861 (CRC) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Oluwafemi Omotoye filed this *pro se* action against TD Bank, N.A., and two of its employees who managed Omotoye during his eight-month stint as a contractor performing anti-money-laundering services for the bank.  Across his various filings, Omotoye alleges that Defendants engaged in unlawful discrimination, retaliation, and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and partook in wage discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d).  Finding that it lacks personal jurisdiction over the individual defendants, that Omotoye has not plausibly alleged that any of the Defendants was his "employer" as required under both statutes, and that he has failed to state a plausible claim regardless, the Court will grant the motion to dismiss all claims.  The dismissal of the claims against TD Bank will be without prejudice, however, because Omotoye could potentially cure these deficiencies in another amended complaint.

### I.  Background

Omotoye, who lives in Washington, D.C., filed suit in December 2022 against TD Bank and two of its employees, Meaghan Tupper and Suzanne Atwood, alleging several causes of action under Title VII and the Equal Pay Act.

The original complaint is thin on factual allegations.  Omotoye generally maintains that, in September 2021, he "began working with Global Technical Talent (GTT)," a staffing agency, which assigned him "to TD Bank as a contractor for the position [of] Anti-Money Laundering Specialist II."  Compl. at 4.[1]  During that assignment, Omotoye contends he "was a top performer" but, because he is Black and Botswanan, he "was treated badly compared to . . . white and Latino employees."  Id.  Omotoye also claims he "experienced sexual harassment" at the hands of Tupper, his manager at TD Bank, beginning in November or December 2021.  Id.  He alleges that Tupper was generally "inappropriate" and "overly sexual" and that, on one occasion, she sent "a picture of her bedroom to the team with sexual undertones."  Id.  "The harassment[] made [him] very uncomfortable," he says, given his status as "the only black male on the team."  Id. at 5.  Omotoye further maintains that he was assigned "tasks that were not described in [his] position description," including training new hires.  Id.  He eventually complained "to GTT that [his] pay and training [were] unfair" and was purportedly terminated soon after "with no reason given."  Id. at 4–5.  The original complaint concluded with a demand for damages totaling $100,000.  Id. at 4.

In May 2023, Defendants moved to dismiss the entire complaint under Federal Rule of Civil Procedure 12(b)(5) for improper service and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Omotoye responded by submitting another complaint naming TD Bank, Tupper, and GTT as defendants.[2]  The Court construed the filing as a motion for leave to

---

[1]  Pincites refer to the ECF numbers.

[2]  This Memorandum Opinion does not address Omotoye's claims against GTT, which was never served with the amended complaint in this action.  The Court will resolve the claims against GTT in a separate civil action.  See Omotoye v. Global Technical Talent, No. 22-cv-3862 (D.D.C. filed Dec. 28, 2022).

file an amended complaint and reserved judgment until briefing on the motion to dismiss had concluded.  See July 5, 2023 Min. Order.

In his new filing, Omotoye alleges that, during his time at TD Bank, he was "the only black male on Ms. Tupper's team" and that "TD Bank and Meaghan Tupper knew [he] was a member of a protected class due to [his] profile picture displayed on [his] email and multiple zoom meetings throughout [his] 8 month tenor [sic] within the organization."  Mot. Am. Compl. at 4, 6.  Armed with that knowledge, he claims, Tupper and others treated him "the worst because of [his] race, gender and country of origin."  Id. at 6.  In particular, Omotoye alleges that he was "looked over for promotions" despite being a "top performer," "not celebrated the same as White and Latino employees," "constantly had to defend [himself] from accusations with racially stereotypical undertones," and was denied "equal access to data and information as [his] co-workers."  Id.  He also re-ups his allegation that Tupper harassed him by making and permitting "sexual jokes" and by sending "a hand written card to [his] personal address doused in her perfume."  Id. at 5.

## II.   Legal Standards

Defendants advance two arguments for dismissal: improper service of process on individual defendants Meaghan Tupper and Suzanne Atwood under Federal Rule of Civil Procedure 12(b)(5) and failure to state a claim upon which relief can be granted under Rule 12(b)(6).

Under Federal Rule of Civil Procedure 12(b)(5), a defendant may move to dismiss an action for "insufficient service of process."  The plaintiff bears the burden of proving that he effectuated proper service.  See Hilska v. Jones, 217 F.R.D. 16, 20 (D.D.C. 2003) (citing Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987)).  "[T]o do so, he must demonstrate that the procedure

employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law." <u>Light</u>, 816 F.2d at 751 (quotation marks omitted).  "[U]nless the procedural requirements for effective service of process are satisfied, a court lacks authority to exercise personal jurisdiction over the defendant." <u>Candido v. District of Columbia</u>, 242 F.R.D. 151, 160 (D.D.C. 2007).  "Although district courts have broad discretion to dismiss a complaint for failure to effect service, dismissal is not appropriate when there exists a reasonable prospect that service can be obtained." <u>Novak v. World Bank</u>, 703 F.2d 1305, 1310 (D.C. Cir. 1983).  In such cases, the court has discretion quash service and instruct the plaintiff to try again.  <u>See, e.g.</u>, <u>Angelich v. MedTrust, LLC</u>, 910 F. Supp. 2d 128, 132 (D.D.C. 2012).

A motion under Rule 12(b)(6) "tests the legal sufficiency of a claim." <u>Sickle v. Torres Advanced Enter. Sols., LLC</u>, 884 F.3d 338, 344 (D.C. Cir. 2018).  To survive such a motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  The Court must construe the complaint "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." <u>Stewart v. Nat'l Educ. Ass'n</u>, 471 F.3d 169, 173 (D.C. Cir. 2006).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.  <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555).  The Court also need not accept a plaintiff's legal conclusions as true, <u>see</u> <u>id.</u>, nor presume the veracity of legal conclusions that are couched as factual allegations, <u>see</u> <u>Twombly</u>, 550 U.S. at 555.

*Pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers," so long as they contain "factual matter" that allows the Court to "infer more than the mere possibility of misconduct." <u>Atherton v. D.C. Off. of Mayor</u>, 567 F.3d 672, 681–82 (D.C.

Cir. 2009) (citation omitted).  Although the Court is not required to "fish" for plausible claims, it may "consider supplemental material filed by a pro se litigant in order to clarify the precise claims being urged." Greenhill v. Spellings, 482 F.3d 569, 572–73 (D.C. Cir. 2007).  The Court also must consider a *pro se* litigant's "filings as a whole before dismissing a complaint," including any opposition to a motion to dismiss. Schnitzler v. United States, 761 F.3d 33, 38 (D.C. Cir. 2014).

Federal Rule of Civil Procedure 15(a)(2) allows a plaintiff to file an amended complaint more than twenty-one days after an answer has been served only with the opposing party's consent or with leave of court.  Leave to amend is to be "freely given when justice so requires" but may be denied due to "futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).  When assessing whether a proposed amended complaint would survive a motion to dismiss, courts apply the same standards as they would to review such motion. See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215–16 (D.C. Cir. 2010) (citations omitted).  The party opposing amendment bears the burden of showing why leave to file an amended pleading should not be granted. See Smith v. Café Asia, 598 F. Supp. 2d 45, 48 (D.D.C. 2009).

### III.   Analysis

A.  Claims Against Individual Defendants

The Court begins by dismissing all claims against the two individual Defendants in this action for improper service.   Federal Rule of Civil Procedure 4(e) states that service of process on an individual within the United States must be made: (1) in accordance with the law "for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made"; (2) by "delivering a copy of the summons and

of the complaint to the individual personally"; (3) by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there"; or (4) by "delivering a copy of each to an agent authorized by appointment or by law to receive service." Omotoye chose none of these options to serve Tupper and Atwood. Instead, he merely effectuated service upon Kathy Jarbae, a Corporate Concierge at TD Bank who was "authorized to accept process on behalf of the organization," but not its employees. See Return of Service at 3. This is not an acceptable form of service in the District of Columbia (where the Court is located) or in Maine (where service was made). See Mot. Dismiss at 7–9. Nor does it satisfy any of the three other ways to serve a defendant. The Court therefore lacks personal jurisdiction over Tupper and Atwood. See Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 514 (D.C. Cir. 2002).

      The Court hastens to add, however, that there was some wisdom in Omotoye's decision to serve only TD Bank—namely, neither Title VII nor the Equal Pay Act authorize suits against individual employees. Title VII permits suits against covered "employers," a statutory term that excludes supervisors and other employees in their individual capacity. Thomas v. Wash. Metro. Area Transit Auth., 305 F. Supp. 3d 77, 86–87 (D.D.C. 2018) (citing Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995). The same goes for the Equal Pay Act. "Courts in this Circuit and elsewhere have recognized that the Equal Pay Act 'overlaps' with Title VII, and the two statutes should be 'construed harmoniously with the result that the principles developed under each be applied interchangeably' with the other." Frett v. Howard Univ., 24 F. Supp. 3d 76, 85 (D.D.C. 2014) (quoting Hardy v. Bowen, No. 85-cv-2119, 1986 WL 15710, at *8 (D.D.C. Nov. 19, 1986)) (cleaned up). This general principle extends to the Equal Pay Act's definition of "employer" and precludes plaintiffs from suing supervisors or other employees for alleged

6

violations.  See id. at 85.  All of Omotoye's claims can therefore proceed only, if at all, against TD Bank.

    B.  <u>Claims Against TD Bank</u>

    Turning to the allegations against TD Bank, all of the claims falter at the outset because Omotoye has not shown that TD Bank was his "employer"—a threshold requirement for liability under Title VII and the Equal Pay Act.  And even assuming TD Bank was his "joint employer" along with GTT, Omotoye has not plausibly alleged a violation of either statute.

    *1.  Joint Employer*

    As just noted, Title VII and the Equal Pay Act prohibit "employers" from discriminating or retaliating against employees.  See 42 U.S.C. § 2000e; 29 U.S.C. § 206(d)(1).  Omotoye has not alleged facts that, taken as true, would indicate that TD Bank was his employer.  He instead alleges that he was directly employed by GTT which, in turn, assigned him to TD Bank to work as "a contractor for the position [of] Anti-Money Laundering Specialist II."  Compl. at 4.  Under such circumstances, it is possible for an individual to be a "joint employee" of both the staffing agency (GTT) and the client entity (TD Bank).  But Omotoye has not plausibly alleged that this is the case here.

    Courts in this District have applied two different tests to determine whether an individual has joint employers, commonly known as the <u>Browning-Ferris</u> and <u>Spirides</u> tests.  See <u>Nytes v. Trustify, Inc.</u>, 297 F. Supp. 3d 191, 204 (D.D.C. 2018).  Under the <u>Browning-Ferris</u> test, courts examine whether "two or more employers exert significant control over the same employee— where it can be shown that they share or co-determine those matters governing essential terms and conditions of employment."  <u>NLRB v. Browning-Ferris Indus. of Pa., Inc.</u>, 691 F.2d 1117, 1124 (3d Cir. 1982).  In making this determination, courts consider:

> [1] the alleged employer's authority to hire and fire the relevant employees; [2] the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; [3] the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and [4] the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

Miles v. Howard Univ., 83 F. Supp. 3d 105, 117 (D.D.C. 2015) (quoting In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig., 683 F.3d 462, 469 (3d Cir. 2012)).  These factors do not comprise an exhaustive list.  Rather, a court's determination must be based on a consideration of the total employment situation.  See In re. Enter. Rent-A-Car, 683 F.3d at 469.

The Spirides test likewise looks to "all of the circumstances surrounding the work relationship" but directs courts to weigh twelve separate factors.  Spirides v. Reinhardt, 613 F.2d 826, 831 (D.C. Cir. 1979).  The first and most important consideration is whether the alleged employer "has the right to control and direct the work of [the] individual, not only as to the result to be achieved, but also as to the details by which that result is achieved."  Id. at 831–32.  After analyzing this primary factor, courts also consider:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

Id. at 832.

"In short, both tests look to the totality of the circumstances and identify 'control' as the 'touchstone' of the joint-employer analysis."  Doe v. Lee, No. 19-cv-0085 (DLF), 2020 WL

759177, at *7 (D.D.C. Feb. 14, 2020) (quoting Al-Saffy v. Vilsack, 827 F.3d 85, 97 (D.C. Cir. 2016)).  "While a plaintiff 'need not allege every facet of her relationship' with the defendant, she must still plead facts which, if proven true, would plausibly suggest that a joint-employment relationship exists."  Id. (quoting Mack v. Aspen of DC, Inc., 248 F. Supp. 3d 215, 220 (D.D.C. 2017)).

Omotoye has failed to allege a joint-employer relationship under either the Browning-Ferris test or the Spirides test.  First and foremost, his complaint and other filings are devoid of allegations that TD Bank controlled the "means and manner" by which he completed his tasks. Spirides, 613 F.2d at 831.  The closest Omotoye comes to addressing this central factor is his general allegation that Tupper served as his manager.  "By itself," that only "indicates that [TD Bank] exercised some supervision over [his] work, but it does not allege that [TD Bank] shared or co-determined the matters governing essential terms and conditions of [his] employment or that [TD Bank] could control and direct both the details and the results of his work."  Mack, 248 F. Supp. 3d at 219 (cleaned up).  The assertion that he had limited interaction with GTT during his assignment also does not suggest TD Bank necessarily filled the void because contractors very often work with no daily oversight.  See Opp'n at 3.  And while the complaint is silent on TD Bank's authority to dictate Omotoye's work schedule or his place of work, Omotoye's admission that he worked entirely remotely during his stint possibly indicates some lesser degree of control than might be present otherwise.  See id.

Many of the other factors also do not support finding that TD Bank was his employer. When it comes to the power to discipline, the complaint does not suggest that TD Bank had the ability to levy penalties or alter his conditions of employment.  Indeed, the most natural reading of the filings is that GTT (not TD Bank) terminated his contract in April 2022.  See Compl. at 5

("I brought this up to GTT that pay and training was unfair and was terminated in close temporal proximity.").  The complaint also contains no allegations suggesting that TD Bank controlled Omotoye's compensation, paid social security or employment taxes, or awarded him retirement benefits.  Regarding the scope and nature of his assignment, Omotoye alleges that GTT assigned him to work as an Anti-Money Laundering Specialist "because of [his] 10 years of banking experience and Master's in Business Administration with a concentration in finance."  Opp'n at 2.  That job description and Omotye's background suggest that he was a pre-trained specialist deployed to perform a particular task—hallmarks of an independent contractor.  See, e.g., Zhengxing v. Nathanson, 215 F. Supp. 2d 114, 118 (D.D.C. 2002).  As to the length of assignment, his several-month tenure does not clearly indicate an employment relationship.  See Redd v. Summers, 232 F.3d 933, 940 (D.C. Cir. 2000) ("Employment relationships tend to be longer or at any rate more likely of indefinite length[.]").  Lastly, the parties plainly did not intend to form an employer-employee relationship:  Omotoye refers to himself as a "contractor," Compl. at 4, and he is identified as such in an exhibit attached to his motion to amend his complaint, see Mot. Am. Compl., Ex. A.

The only factor that unequivocally favors Omotoye's bald assertion that TD Bank was his "joint employer" is the allegation, contained in his motion to amend the complaint, that TD Bank furnished all the equipment he used.  Id. at 5.  But that allegation alone is not enough to tip the scales back in his favor.  See Redd, 232 F.3d at 940 (calling the provision of office supplies "de minimis").  Weighing all the factors, the Court concludes that Omotoye has not plausibly alleged that TD Bank functioned as his joint employer.  Cf. Mack, 248 F. Supp. 3d at 220 ("Mack need not allege every facet of her relationship with DC DGS to allege that it was a joint employer. But she must provide more detail than she has for the Court to [conclude] that the District was

her employer for purposes of Title VII liability, particularly when she explicitly alleges that another entity—Aspen—was her employer.").  That determination dooms Omotoye's statutory claims against TD Bank.  But the problems with his claims do not end there.

### 2.  *Discrimination Based on Race, Color, Sex and National Origin*

Even if Omotoye had passed the threshold of plausibly alleging that TD Bank was his joint employer, both his Title VII and Equal Pay Act claims face additional hurdles that he has not cleared.  The Court begins with Omotoye's charge that TD Bank discriminated against him because of his race, color, sex, and national origin in violation of Title VII.

To plead a viable discrimination claim under Title VII, a plaintiff must plausibly allege that he suffered an "adverse employment action" because of his race, color, religion, sex, or national origin.  Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  As the D.C. Circuit has clarified, a plaintiff does not need to show that the challenged employment action resulted in "objectively tangible harm" so long as he was discriminated against with respect to the "terms, conditions, or privileges of employment."  Chambers v. District of Columbia, 35 F.4th 870, 872, 874–75 (D.C. Cir. 2022) (en banc) (quoting 42 U.S.C. § 2000(e)-2(a)(1)).  "[A]t the motion-to-dismiss stage, the guiding lodestar is whether, assuming the truth of the factual allegations, taken collectively, whether the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported."  Townsend v. United States, 236 F. Supp. 3d 280, 298 (D.D.C. 2017).  Omotoye's allegations fall short of that standard.

Many of Omotoye's complaints of poor treatment do not qualify as "adverse employment actions," even under Chambers, because they did not affect his "terms, conditions, or privileges of employment."  See 35 F.4th at 874 ("[N]ot everything that happens at a workplace affects an employee's 'terms, conditions, or privileges of employment.'").  Omotoye alleges that he "was

treated worst because of [his] race, gender, and country of origin," "was not celebrated the same as White and Latino employees," and "constantly had to defend [himself] from accusations with racially stereotypical undertones."  Mot. Am. Compl. at 6.  Apart from being conclusory, these allegations do not rise to the level of an adverse employment action that can support a claim of discrimination.  See, e.g., Ali v. District of Columbia Gov't, 810 F. Supp. 2d 78, 86 (D.D.C. 2011) (finding that "criticism from a supervisor that does not affect a subordinate's employment status or opportunities is not adverse action"); Redmon v. YMCA of Metro. Wash., 417 F. Supp. 3d 99, 103 (D.D.C. 2019) (noting intentional discrimination claims must "go beyond an unadorned, the-defendant-unlawfully-harmed-me accusation").[3]

Other allegations straddle the line of an adverse employment action—including Omotoye's claims that he "did not have the same equal access to data and information as [his] coworkers" and that he was required to perform tasks, such as training new hires, that fell outside of his purview.  Mot. Am. Compl. at 6; see Opp'n at 5.  Prior to Chambers, it was well-settled that such "changes in assignments and work-related duties [did] not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997).  The extent to which Chambers upended that line of decisions is an open question.  "Perhaps not all changes in work assignments necessarily constitute adverse actions even under Chambers," other courts in this

---

[3] Although Omotoye does not assert a Title VII hostile-work-environment claim, these allegations sound more in that register.  But even if it were appropriate to consider this unalleged cause of action, the Court does not find that Omotoye meets the demanding standard of proving a hostile work environment with these vague and conclusory allegations.  See Hill v. Assocs. for Renewal in Educ., Inc., 897 F.3d 232, 237 (D.C. Cir. 2018) (holding that, to state a hostile-work-environment claim, a plaintiff must allege "that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (quotation marks omitted)).

District have held, but "allegations regarding work assignments that are disproportionately burdensome and unpleasant plainly suffice." Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 56 (D.D.C. 2022).  It is debatable whether Omotoye's allegations meet this standard.  But even if they constitute adverse employment actions, these allegations cannot serve as the basis for a Title VII discrimination claim for a separate reason:  Omotoye has not plausibly alleged TD Bank took these actions because of his race, color, national origin, or sex.  Regarding his claim that he was saddled with training new hires, Omotoye never attempts to connect this allegation to one of his protected traits.  And as to the denial of data access, it is true that a plaintiff can make out a prima facie case of discrimination "by demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class." George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).  Yet here, Omotoye offers no indication whether these other "employees" are truly "similarly situated."  It instead appears far more likely that TD Bank "employees" were afforded access to data that Omotoye, as a contractor, was denied for reasons entirely unrelated to any protected characteristics.

Only two allegations clearly qualify as adverse employment actions: the purported denial of promotions and Omotoye's termination in April 2022.  But neither supports a plausible claim of discrimination here.  In a "refusal-to-promote discrimination case," the plaintiff bears the initial burden of showing that "(i) the employee 'belongs to a racial minority' or other protected class; (ii) the employee 'applied and was qualified for a job for which the employer was seeking applicants'; (iii) despite the employee's qualifications, the employee 'was rejected'; and (iv) after the rejection, 'the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'"  Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973)).  Omotoye never alleges that he sought a promotion, nor is it evident that he would be

eligible for any promotion at TD Bank given his status as a contractor.  As to his termination,

Omotoye does not allege that he was fired because of his protected status but rather because he

complained about his perceived unfair treatment.  This allegation is therefore properly addressed

under Title VII's retaliation framework, to which the Court now turns.

> ### 3.  Retaliation

Title VII "forbids retaliation against an employee because [he] has 'opposed any practice

made an unlawful employment practice by' Title VII, or because [he] 'made a charge' under

Title VII."  Allen v. Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)).

To state a viable retaliation claim, a plaintiff must "allege that [he] engaged in activity protected

by Title VII, the employer took adverse action against [him], and the employer took that action

because of the employee's protected conduct."   Walker v. Johnson, 798 F.3d 1085, 1091–92

(D.C. Cir. 2015).  Omotoye's retaliation claim fails at the third prong because it does not appear

that TD Bank was responsible for his termination in April 2022.

In the original complaint, Omotoye alleged he "brought . . . up to GTT that [his] pay and

training [were] unfair and was terminated within close proximity."  Compl. at 5.  The natural

inference is that GTT, not TD Bank, was responsible for his termination—which makes sense

given that GTT appears to have been Omotoye's sole employer.  After Defendants raised this

objection in their motion to dismiss, see Mot. Dismiss at 18, Omotoye filed a motion to amend

his complaint in which he claimed, for the first time, that he also complained to Tupper on the

same day he aired his grievances with GTT, see Mot. Am. Compl. at 5.  Even accepting this late-

breaking allegation as true, asserting that an official at TD Bank had knowledge of his supposed

protected activity only gets Omotoye so far.  To carry the day on his retaliation claim, Omotoye

also must show that TD Bank or its officials were responsible for his termination.  He has not done so.  Even with the new allegations, it still appears that GTT fired him, and TD Bank cannot be found liable for an action it did not take or otherwise influence.

### 4.  *Sexual Harassment*

Omotoye further alleges that Ms. Tupper sexually harassed him during his time at TD Bank.  But his sparse allegations do not satisfy the demanding standard for harassment under Title VII.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  "To establish a prima facie case of hostile work environment based on sexual harassment, a plaintiff must demonstrate that (1) [he] is a member of a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment occurred because of [his] sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment."  Craig v. District of Columbia, 74 F. Supp. 3d 349, 370 (D.D.C. 2014) (citations omitted).  An actionable claim must establish "a sexually objectionable environment . . . both objectively and subjectively offensive, . . . that a reasonable person would find hostile or abusive, and . . . that the victim did in fact perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  "[O]nly when offensive conduct 'permeates the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment'" is there a violation.  Barbour v. Browner, 181 F.3d 1342, 1347–48 (D.C. Cir. 1999) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)) (brackets omitted).  The severity and pervasiveness of the alleged harassment is

assessed from the perspective of a reasonable employee in plaintiff's situation, see Oncale, 523 U.S. at 81, and courts must consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance," Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

Omotoye's allegations do not measure up.  He claims Tupper was "inappropriate," "overly sexual," and "allow[ed] and ma[de] sexual jokes during meetings."  Compl. at 4; Mot. Am. Compl. at 5.  These conclusory allegations provide little detail about Tupper's actual behavior and do not support a claim of sexual harassment.  See, e.g., Wallace v. Aramark @ Cap. One Arena, No. 22-cv-00472 (APM), 2022 WL 17485719, at *2 (D.D.C. Dec. 7, 2022) (holding summary allegations are not enough to state a claim of sexual harassment).  The two more concrete facts that Omotoye advances do not hit the mark either.  Omotoye says Tupper "sent a picture of her bedroom to the team" that purportedly had "sexual undertones."  Compl. at 4.  But again, he does not describe the photo or provide any support for his characterization of it as carrying sexual connotations.  And the law is clear that attempts to "characterize [a defendant's] behavior" rather than plead "specific facts" supporting the characterization do not cut it.  Ahuja v. Detica Inc., 742 F. Supp. 2d 96, 104 (D.D.C. 2010).  He also complains that Tupper mailed him "a hand written card . . . doused in her perfume."  Opp'n at 2.  Yet he again provides no particulars about the alleged card that would show it to be harassing rather than simply a kind gesture from a coworker.  Taken together, then, Omotoye has not plausibly alleged any conduct or pattern of behavior that would be sufficiently severe or pervasive to a reasonable employee.

      5.   *Equal Pay Act*

Omotoye's final claim is under the Equal Pay Act, which was passed "to remedy the 'ancient but outmoded belief' that a man should be paid more than a woman for performing the same duties." Cornish v. District of Columbia, 67 F. Supp. 3d 345, 360 (D.D.C. 2014) (citation omitted). To achieve this aim, the Equal Pay Act makes it unlawful to "discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). As this statutory mandate makes clear, the Act's scope is limited: "[T]he Act applies only to pay disparities stemming from sex discrimination. Pay disparities due to other reasons, by contrast, are not actionable." Kangethe v. District of Columbia, 953 F. Supp. 2d 194, 202–03 (D.D.C. 2013). Thus, to establish a violation, a plaintiff must allege he received unequal pay compared to an employee of another sex while performing a job with substantially "equal skill, effort, and responsibility." Johnson v. Wash. Metro. Area Transit Auth., No. 19-cv-3534 (CRC), 2022 WL 4547527, at *3 (D.D.C. Sept. 29, 2022) (quoting Goodrich v. Int'l Bhd. of Elec. Workers, 815 F.2d 1519, 1522 (D.C. Cir. 1987)).

Omotoye has not done so here. He never alleges that he was paid less than employees of the opposite sex for equal work. He instead claims that he was required to perform tasks, such as training new hires, that fell outside his job description and for which he was not properly compensated. See Compl. at 5. Omotoye may believe that his "pay . . . was unfair," id., but he fails to allege that any disparity in pay was the result of sex discrimination.

C.  Motion to Amend the Complaint

Because it must consider all of a *pro se* plaintiff's submissions before dismissing his

complaint, see Schnitzler, 761 F.3d at 38, the Court, in effect, has entertained the motion for

leave to amend and found it wanting.  Omotoye's motion for leave to amend the complaint is

therefore denied as futile.

But precedent requires the Court to give Omotoye one more bite at the apple.  The D.C.

Circuit has held that "dismissal *with prejudice* is warranted only when a trial court determines

that the allegations of other facts consistent with the challenged pleading could not possibly cure

the deficiency." Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 131 (D.C. Cir. 2012) (citation

omitted).  While it has doubts, the Court is not, as of now, entirely convinced that Omotoye

would be unable to plead other facts, consistent with his current filings, that would cure the

deficiency and plausibly allege that TD Bank was his joint employer and violated Title VII

through one of the avenues above.

To be sure, the general presumption against dismissal with prejudice absent a finding of

futility has limits.  A court may dismiss a complaint with prejudice when a plaintiff shows a

"repeated failure to cure deficiencies."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir.

1996) (cleaned up).  Under this exception, courts within this District have dismissed claims with

prejudice upon reaching their second or third amended complaints.  See, e.g., Ruiz v. Millennium

Square Residential Ass'n, No. 19-cv-03765 (TNM), 2022 WL 296200, at *9 (D.D.C. Feb. 1,

2022), (D.C. Cir. Feb. 1, 2023) (second); Joyner v. Morrison & Foerster LLP, No. 20-cv-1440

(TJK), 2023 WL 6313194, at *13 (D.D.C. Sept. 27, 2023) (third).  Omotoye's single failure to

fix the flaws in his complaint with his first amendment, though, does not yet constitute a pattern

of unsuccessful attempts to cure the current deficiencies.  See Belizan v. Hershorn, 434 F.3d 579,

584 (D.C. Cir. 2006) (citing favorably to <u>Bly–Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir.

2001), for granting leave to amend "even though plaintiff failed in first amended complaint to

plead fraud with specificity required by Rule 9(b)").  The Court will therefore dismiss the claims

against TD Bank without prejudice to give Omotoye one more chance to fix the identified issues

with his claims.  The Court cautions Omotoye, however, that like all other litigants, he must have

a good faith basis for any factual allegation he includes in any proposed amended complaint.

### IV.   Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 7] Defendants' Motion to Dismiss is GRANTED; it is further

**ORDERED** that [Dkt. No. 9] Plaintiff's Motion for Leave to File Amended Complaint is

DENIED; it is further

**ORDERED** that the Complaint is dismissed with prejudice with respect to the claims

against the two named employees but without prejudice with respect to the claims against TD

Bank; it is further

**ORDERED** that Plaintiff shall file a motion for leave to file an amended complaint,

attaching the proposed amended complaint, within 30 days of this Order; it is further

**ORDERED** that, should Plaintiff not seek leave to amend, both the remaining claims and

the case will be dismissed with prejudice in a final, appealable order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 12, 2024</u>